DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ADRIANNE NOLDEN,**
Appellant,

v.

**SUMMIT FINANCIAL CORPORATION,** a Florida corporation, **DAVID WHEELER, ALVIN WHEELER, ART RICHARDSON,** and **HOLCOMBE USA, INC.,** a Florida corporation d/b/a AutoShow Sales and Service,
Appellees.

No. 4D17-1040

[April 25, 2018]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Carlos Augusto Rodriguez, Judge; L.T. Case No. CACE-14-009704 (14).

Kenneth J. Kavanaugh of Kenneth J. Kavanaugh, P.A., Davie, for appellant.

William J. Denius of Killgore, Pearlman, Semanie, Denius & Squires, P.A., Orlando, for appellees, Summit Financial Corporation, a Florida corporation, David Wheeler, Alvin Wheeler and Art Richardson.

Robert E. Sickles and Jason S. Lambert of Broad and Cassel, Tampa, for appellee, Holcombe, USA, Inc., d/b/a AutoShow Sales and Service.

GROSS, J.

This lawsuit arose out of Adrianne Nolden's financed purchase of a used car. Central to her five-count complaint was the claim that the 27.81% interest charge under the purchase contract exceeded the 18% interest rate limit imposed by Florida's usury statute. We hold that this case is controlled not by the usury statute but by Chapter 520, Florida Statutes (2009), and affirm the summary final judgment for the defendants entered by the circuit court.

In her third amended complaint, Nolden (the "buyer") sued Summit Financial Corporation and two of its employees. She later added Holcombe, USA, Inc. (d/b/a AutoShow Sales and Service) as a fourth

defendant. The complaint sets forth causes of action related to the purchase of a 2004 Pontiac Grand Prix from AutoShow and the repossession of the car in 2013 by Summit. The buyer sued both Summit Financial and AutoShow for criminal usury and for violations under Chapter 772, Florida Statutes (2009), the Civil Remedies for Criminal Practices Act. § 772.101, Fla. Stat. (2009).

Summit Financial and AutoShow answered the complaint setting forth several defenses including:

(1) A contract for the purchase of a used automobile with a deferred payment plan is not subject to Florida's general usury statute; and

(2) The interest charged is allowable under the Motor Vehicle Retail Sales Finance Act which governs the transaction.

Summit Financial moved for summary judgment. Attached to the motion was an employee's affidavit. He attested that:

- The buyer entered into a Retail Installment Sale Contract for the purchase of the car. The contract gave the buyer the option of buying the car for cash or on credit – by signing the contract, the buyer chose to buy the car on credit.

- The contract was assigned to Summit Financial, which is an automotive finance company.

- The contract was not a contract for the loan of money. The contract was for the purchase of the car.

A copy of the contract (the "contract") was attached to the employee's affidavit. The contract is titled:

**RETAIL INSTALLMENT SALE CONTRACT**
**SIMPLE FINANCE CHARGE**

The parties to the contract are Nolden as the buyer and AutoShow as the seller. The contract is a pre-printed form with blanks filled in setting forth the details of the transaction. The first page provides an "itemization of amount financed" including cash price of the car ($11,694.10); the buyer's down payment ($2,500); and "other charges" that are itemized and added to the price (totaling $2,688.91). The total "amount financed" is listed as <u>$11,883.01</u>.

The contract states that the buyer may purchase the car for cash or on credit. If the buyer chooses to buy on credit, the contract sets forth the financing terms that will apply:

> You, the Buyer . . . may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Seller-Creditor . . . the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis at the Base Rate of <u>27.81</u>% per year. The Truth-In-Lending Disclosures are part of this contract.

Truth-In-Lending Disclosures appear on the first page:

| FEDERAL TRUTH-IN-LENDING DISCLOSURES | | | | |
|---|---|---|---|---|
| **ANNUAL PERCENTAGE RATE** The cost of your credit as a yearly rate. | **FINANCE CHARGE** The dollar amount the credit will cost you. | **Amount Financed** The amount of credit provided to you or on your behalf. | **Total of Payments** The amount you will have paid after you have made all payments as scheduled | **Total Sale Price** The total cost of your purchase on credit, including your down payment of $ _2,500.00_ is |
| 27.810    % | $ _8,163.71_ | $ _11,883.01_ | $ _20,046.72_ | $ _22,546.72_ |
| **Your Payment Schedule Will Be:** | | | | |
| Number of Payments | Amount of Payments | When Payments Are Due | | |
| 48 | 417.64 | Monthly beginning    03/06/09 | | |

The contract provides that it is assignable, and the copy of the contract in evidence shows that it was assigned to Summit Financial.

AutoShow also moved for summary judgment. Its motion was supported by the affidavit of its office manager, who attested to the following relevant facts:

- The buyer purchased the car from AutoShow in an installment sales transaction and the buyer executed a Retail Installment Sales Contract.

- AutoShow is a licensed motor vehicle retail installment seller.

- The buyer was given a copy of the contract at the time of her purchase.

- After the buyer purchased the car, the contract was sold to Summit Financial.

AutoShow also filed two certificates issued by the Florida Office of Financial Regulation. The certificates demonstrate that AutoShow was licensed to conduct business as a "Motor Vehicle Retail Installment Seller" under Chapter 520, Florida Statutes, and Summit Financial was licensed to conduct business as a "Sales Finance Company" under Chapter 520.

The buyer filed depositions of witnesses and her own sworn statement, none of which raise an issue of *material* fact.

### *The Circuit Court Properly Ruled that the Contract Was Not Subject to Florida's General Usury Statute*

Summary judgment was properly granted on two grounds. First, the "legal rate" of interest set forth in the Motor Vehicle Retail Sales Finance Act is the rate applicable to this transaction. Second, the extension of credit for the purchase of goods is not a "loan" under the usury statute.

Usury requires proof of four elements: (1) an express or implied loan; (2) a repayment requirement; (3) an agreement to pay interest in excess of the legal rate; and (4) a corrupt intent to take more than the legal rate for the money loaned. *Oregrund Ltd. P'ship v. Sheive*, 873 So. 2d 451, 456 (Fla. 5th DCA 2004). The buyer, as the party claiming usury, has the burden of establishing its elements. *Video Trax, Inc. v. NationsBank, N.A.*, 33 F. Supp. 2d 1041 (S.D. Fla. 1998).

Here, the parties disputed the third element, the "legal rate" of interest, and the first element, whether the transaction was a "loan."

### *I. The "Legal Rate" of Interest is Set Forth in the Motor Vehicle Retail Sales Finance Act*

The buyer argues that the legal rate of interest that applies to her transaction is set forth in the usury statute, Chapter 687, Florida Statutes (2009). AutoShow and Summit Financial contend, as the trial court ruled, that the legal rate of interest for this transaction is set forth in the Motor Vehicle Retail Sales Finance Act, Chapter 520, Florida Statutes (2009).[1] The trial court's finding is correct because (1) the contract is a retail

---

[1] All references are to the 2009 version of the statute, the version in effect when the contract was executed. *See Holland v. Gross*, 89 So. 2d 255, 258 (Fla. 1956).

installment sales contract; and (2) under the rules of statutory construction, the more specific statute controls over the general usury statute.

### A. *This Transaction Resulted in a Retail Installment Sales Contract*

In order for AutoShow and Summit Financial to charge the interest rate permitted by Chapter 520, it was first necessary to establish that the transaction resulted in a "Retail Installment Sales Contract." The trial court's finding on this issue is supported by the following undisputed evidence:

1. The title of the document is Retail Installment Sale Contract. The title appears in bold capital letters on the first page.

2. The agreement itself complied with the statutory requirements imposed on Retail Installment Sales Contracts. The agreement includes the requisite "notice to buyer" section and a separate written itemization of the amount financed. § 520.07, Fla. Stat. (2009).

3. The terms of the agreement fit squarely within the statutory definition of a Retail Installment Sales Contract:

> "Retail installment contract" . . . means an agreement, entered into in this state, pursuant to which the title to, or a lien upon the motor vehicle, which is the subject matter of a retail installment transaction, is retained or taken by a seller from a retail buyer as security, in whole or in part, for the buyer's obligation.

> § 520.02(17), Fla. Stat. (2009).

4. AutoShow and Summit Financial were licensed under Chapter 520. The buyer met the definition of a buyer as that term is defined by Chapter 520.[2]

---

[2] AutoShow was licensed as a "motor vehicle retail installment seller," "a person engaged in the business of selling motor vehicles to retail buyers in retail installment transactions." § 520.02(11), Fla. Stat. (2009). Summit Financial was licensed as a "sales finance company," "a person engaged in the business of purchasing retail installment contracts from one or more sellers." § 520.02(19), Fla. Stat. (2009). The buyer was a "retail buyer," "a person who buys a motor vehicle from a seller not principally for the purpose of resale, and who executes

5. The parties' conduct under the agreement supports the court's finding that it was a Retail Installment Sales Contract. The buyer received a car. The seller received a piece of paper evidencing the buyer's obligation to pay for the car in installments with interest. The seller also retained a lien as security for the buyer's obligation.

For these reasons, the trial court's finding that the contract was a retail installment sales contract is supported by the title of the document, the language of the document, the terms of the document, the characteristics of the parties, and the conduct of the parties.

*B. Rules of Statutory Construction Compel the Conclusion That the Legal Interest Rate Set Forth in Chapter 520 Applies to This Transaction, and Not the 18% Interest Rate Contained in the Usury Statute*

Section 520.08 identifies four classes of vehicles and sets forth a sliding scale which allows the imposition of a higher finance charge for transactions involving older vehicles. For the buyer's car, Chapter 520 dictated that the finance charge "shall not exceed . . . $17 per $100 per year." § 520.08(1)(d), Fla. Stat. (2009). In lieu of a "finance charge," Chapter 520 permits imposition of "simple interest" so long as the simple interest rate does not exceed the finance charge permitted by section 520.08 on the unpaid balance. § 520.085, Fla. Stat. (2009). Here, it is undisputed that the interest rate of 27.810% was permissible under Chapter 520.[3]

---

a retail installment contract in connection therewith. . . ." § 520.02(16), Fla. Stat. (2009).

[3] The formula for calculating the finance charge in terms of dollars per $100 per year is

$$\frac{\text{Finance Charge}}{\text{Length of time Financed}} \div \frac{\text{Amount Financed}}{\$100} = \text{Finance Charge per \$100 per year}$$

*See In re Corcoran*, 268 B.R. 882, 888 (M.D. Fla. 2010). Plugging in the numbers in this case, leads to the conclusion that the finance charge in this case was $16.48 per $100 per year, which is less than the $17.00 per year allowed by section 520.08(1)(d):

$$\frac{\$8163.71}{4.17 \text{ years}} \div \frac{\$11,883.01}{\$100} = \$16.48/\text{year}$$

Under the usury statute, interest exceeding 18% is usurious. § 687.02, Fla. Stat. (2009). Therefore, the usury statute conflicts with Chapter 520 which allows the imposition of higher interest rates.

"When reconciling statutes that may appear to conflict, the rules of statutory construction provide that a specific statute will control over a general statute. . . ." *Fla. Virtual Sch. v. K12, Inc.*, 148 So. 3d 97, 102 (Fla. 2014). Thus,

> Under basic statutory principles, when two statutes embrace the same subject and produce contradictory results, we are compelled to construe the statutes so that the specific statute is given effect and the general statute is given effect only to the extent that it does not contradict the specific statute.

*Lunohah Invs., LLC v. Gaskell,* 158 So. 3d 619, 621 (Fla. 5th DCA 2013).

Here, the two statutes embrace the same subject (allowable interest rates), and produce contradictory results (what is usurious under Chapter 687 is permissible under Chapter 520). For this reason, the trial court was "compelled" to give effect to the more specific statute (Chapter 520) while giving effect to the more general statute (the usury statute) only to the extent the general statute did not contradict the specific statute. *Lunohah,* 158 So. 3d at 621; *see also A to Z Props., Inc. v. Fairway Palms II Condo. Assoc., Inc.*, 137 So. 3d 453 (Fla. 4th DCA 2014).

Because the statutes covered the same subject yet reached contradictory results, the circuit court properly applied the rules of statutory construction and concluded that the interest rate set forth in Chapter 520 governs this retail installment transaction involving the sale of a motor vehicle. The interest charged did not exceed the permissible interest rate allowed under Chapter 520 and the contract was not usurious under Chapter 687. The defendants were entitled to entry of summary judgment.

## II. The Agreement in This Case Is Not a "Loan" Under the Usury Statute

The defendants were also entitled to entry of summary judgment because the transaction in this case was not a "loan" under the usury statute. The buyer argues that the usury statute is clear and unambiguous and that it applies to all contracts charging interest unless the transaction is specifically excluded under Chapter 687. The statute, however, expressly applies only to "contracts for the payment of interest

upon any loan, advance of money, line of credit, or forbearance to enforce the collection of a debt."  § 687.02(1), Fla. Stat. (2009).

"The law is well settled that usury can only attach to a loan of money, or to the forbearance of a debt. . . ."  *Davidson v. Davis*, 52 So. 139, 139 (Fla. 1910); *see also Nelson v. Scarritt Motors*, 48 So. 2d 168, 168–69 (Fla. 1950) ("[O]ur usury statutes have generally been construed as if directed to contracts for the loan of money.").  In order to determine whether a transaction is a "loan" within the meaning of the usury statute, courts look to the substance of the transaction.  *Oregrund*, 873 So. 2d at 457.

Florida courts have repeatedly held that contracts to secure the price of property sold are not governed by general usury laws.

> [T]he usury statutes condemn usury charges made as an incident to a loan of money.  We have held that the same rule does not apply to a transaction representing the purchase price of property.

*Perry v. Beckerman*, 97 So. 2d 860, 862 (Fla. 1957) (citing *Davidson*, 52 So. at 139 (contract for sale of land); *Scarritt Motors*, 48 So. 2d at 168 (contract to purchase used car "not amenable to the charge of usury.")).

A 1958 Attorney General Opinion recognized that sellers and finance companies qualified under Chapter 520 receive "rights and privileges" including the ability to enter contracts that are not "amenable to the general usury statutes."  Op. Att'y Gen. Fla. 58-56 (1958).

The third district relied upon the Attorney General Opinion in *B & D, Inc. of Miami v. E-Z Acceptance Corp.*, 186 So. 2d 29 (Fla. 3d DCA 1966). *B & D* involved the enforceability of retail installment sales contracts for used motor vehicles where the contracts charged interest in excess of that allowed by the general usury statute.  The court found that the contracts "are not subject to the general usury statutes."  *Id.* at 30.

*Taylor v. First Nat'l Bank of Miami*, 270 So. 2d 379 (Fla. 3d DCA 1972), is even more factually on point.  There, the buyer defaulted on a motor vehicle retail installment sales contract.  *Id.* at 380.  The buyer's car was repossessed and sold, and the assignee of the contract sued the buyer for the deficiency.  *Id.*  The buyer argued that the contract was usurious "on its face."  *Id.*  The court disagreed, finding that the contract was controlled by Chapter 520 and that the finance charges were not in excess of those authorized by section 520.08.  *Id.* (citing *Scarritt Motors*, 48 So. 2d at 168).

The buyer has offered no legal basis to distinguish this case from *B & D, Taylor,* and *Scarritt Motors.* On this record, the circuit court properly found that the contract in this case, to secure the price of property sold, is not subject to Florida's general usury statutes. It is within the purview of the legislature to decide what interest rates are permissible; Chapter 520 contains a legislative determination that some higher risk loans are entitled to a higher interest rate than the one allowed by the general usury statute. There are no disputed material facts that preclude the entry of the summary judgment below.

### *Section 687.12, Florida Statutes (2009), Did Not Require the Words "Chapter 520" to Appear on the Face of the Agreement*

We briefly address the buyer's argument that the words "Chapter 520" were required to appear on the face of the agreement to exempt the agreement from the usury statute. This argument is based on a misapplication of section 687.12, Florida Statutes (2009), known as the "parity exception."

Section 687.12 is entitled "Interest rates; parity among licensed lenders and creditors." Under that section, licensed lenders are permitted to take advantage of interest rates permitted by a different class of licensed lender. *South Pointe Dev. Co. v. Capital Bank,* 573 So. 2d 939, 941 (Fla. 3d DCA 1991). For instance, a bank licensed under chapter 658 can charge the same interest rate as a savings and loan association licensed under chapter 665 so long as the bank complies "with all the requirements imposed on such a lender for the type of loan it is making," and indicates on the instrument "the specific chapter of the Florida Statutes authorizing the interest rate charged." *Id.* (quoting § 687.12(4)).

The parity exception is not applicable to the transaction in this case because the seller here was licensed under Chapter 520 and was entitled to enjoy the "rights and privileges of said statute" by virtue of its license under that chapter. Op. Att'y Gen. Fla. 58-56 (1958). One of those rights was the right to charge interest in an amount allowed under Chapter 520 even where that interest rate exceeds the amount permitted by the usury statute. In this transaction, the lender was not trying to take advantage of a rate authorized for a different type of lender under a different chapter of the Florida Statutes.

Only lenders "making loans . . . at a rate of interest that, *but for this section,* would not be authorized" are required to indicate on the instrument "the specific chapter of the Florida Statutes authorizing the interest rate charged." § 687.12(4), Fla. Stat. (2009) (emphasis added).

AutoShow was not required to write "Chapter 520" on the agreement because, as a licensed seller under Chapter 520, AutoShow did not need to rely on the parity exception to charge the interest rate allowed by Chapter 520.

*Affirmed.*

WARNER and LEVINE, JJ., concur.

\*       \*       \*

***Not final until disposition of timely filed motion for rehearing.***